# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re ) | Chapter 7 |
| ) | |
| Janice Faye Hopson, ) | |
| ) | |
| Debtor. ) | Case No. 15 B 43653 |
| _____) | |
| ) | |
| Janice Faye Hopson, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 16 A 206 |
| ) | |
| Illinois Student Assistance Commission and ) | |
| U.S. Department of Education, ) | |
| ) | |
| Defendants. ) | Honorable Jacqueline P. Cox |
| _____) | |

## MEMORANDUM OPINION

This matter comes before the court on the Chapter 7 Debtor's (hereinafter "Ms. Hopson," "Debtor," or "Plaintiff") adversary proceeding against the Illinois Student Assistance Commission ("ISAC") and the United States Department of Education ("DOE") seeking discharge of her student loans pursuant to 11 U.S.C. § 523(a)(8). This adversary was originally filed pro se; the court appointed Attorney Adam Merrill from Sperling Slater, P.C. to represent the Debtor pro bono. After the defendants answered initial and amended complaints and the entry of initial and amended pre-trial orders, this matter proceeded to trial on May 10, 2018. Based on the pleadings, the evidence submitted at trial, counsels' arguments, and for the reasons

Page 1 of 12

set forth in this opinion, the court finds that the Debtor has not met her burden under 11 U.S.C. § 523(a)(8) and that her student loan debts owed to ISAC and DOE are not dischargeable.

*I. Educational and Loan History*

Ms. Hopson began her college education at Central Y Junior College which she attended from 1972-73. Adv. Dkt. No. 64, Amended Joint List of Stipulated Facts and Documents ("AJSF"), p. 2. She then attended Kennedy King College from 1973-75, and from there the University of Illinois at Chicago from 1975-77. *Id.* Ms. Hopson pursued a course of study at Chicago State University; she was awarded a BS in Criminology from there in 1978. *Id.* She took out student loans in pursuit of her undergraduate degree; those loans were discharged when she filed for bankruptcy in 1984. Tr. Transcript, p. 117.

Ms. Hopson continued her education in 1999 when she attended Aurora University; she received a Master's degree in Social Work ("MSW") from there in 2002. AJSF, p. 2. From 2010-14, Ms. Hopson pursued and obtained a Master's degree in Non-Profit Administration ("MNA") from North Park University. *Id.* at 3. The student loans at issue in this adversary are those that Ms. Hopson incurred to attend Aurora University and North Park University. *Id* at 2-3. The Debtor asserts that if she were forced to begin making payments on her student loans she would have to pay $1,111 per month over ten years. Adv. Dkt. 62, Plaintiff's Trial Brief, p. 4.

To fund her Aurora University MSW, Ms. Hopson took out eight separate ISAC-guaranteed student loans totaling $53,875. AJSF, p. 2. ISAC is a State of Illinois Commission that participates in the Federal Family Education Loan Program ("FFELP"). *Id.* The loans that lenders make under FFELP are guaranteed against default by ISAC, and are then reinsured by the

United States of America. *Id.* In September, 2003 Ms. Hopson consolidated all of her ISAC-guaranteed student loans into one $57,186 Federal Family Education consolidated loan. *Id.* ISAC is now the servicer and holder of the consolidated student loan. *Id.* ISAC acknowledges that Ms. Hopson made at least 37 payments towards her student loans while she was not in school and that the loans were not in deferment. *Id.* at 3. As of March 6, 2018, Ms. Hopson's ISAC-Guaranteed FFELP student loan balance was $71,380. *Id.* at 3. Before filing for bankruptcy, Ms. Hopson's was in a $0 monthly repayment plan[1]. *Id.* at 4.

To fund her North Park University MNA, Ms. Hopson took out eight student loans from the DOE totaling $29,441. AJSF, p. 3. The DOE provides student loans through its Direct Lending Program. *Id.* at 2. Nelnet Servicing, LLC ("Nelnet") services these loans but does not own them. *Id.* As of March 6, 2018 Ms. Hopson's balance on her DOE student loans was $37,496. All of Ms. Hopson's DOE student loans are currently enrolled in an income-based repayment plan ("IBR"); her current monthly payment is $0 per month. *Id.* at 5.

*II. Work History and Earnings*

After obtaining her undergraduate degree in 1978, Ms. Hopson worked as a Child Welfare Specialist with the Illinois Department of Children and Family Services ("DCFS") for 13 years. AJSF, p. 2. Ms. Hopson explained that she left DCFS because she wanted to increase her pay by becoming a social worker at DCFS which required a MSW. Tr. Transcript, p. 25.

In 2002, Ms. Hopson obtained her MSW and began applying unsuccessfully for social worker and public administrator positions at DCFS. Tr. Transcript, p. 27. Ms. Hopson applied

---

[1] These payments are based on her income and do not disqualify her from seeking a discharge in bankruptcy.

for positions at DCFS for 10 years; she was not rehired. *Id.* at 28. In the interim, Ms. Hopson worked full-time at a number of social service agencies that had DCFS contracts where her annual pay never exceeded $32,000 per year. *Id.* at 31-32.

In addition to her work at social service agencies, Ms. Hopson co-founded the non-profit Bradley Youth Center ("Center") in 2003 to house and help homeless youth acquire life skills. AJFS p. 3. To fund the Center, Ms. Hopson secured grants, raised funds, and contributed personal funds. *Id.* In 2005, Ms. Hopson purchased a building; she lived there; it also housed the Center. Tr. Transcript, p. 34. The State of Illinois paid Ms. Hopson $500 per month for each young person that lived in the home. She hosted three to eight children at a time. *Id.* at 37.

When South Shore Bank refinanced the mortgage on the home, title to the home was transferred to the Center. Tr. Transcript, 38-39. She agreed to personally guarantee the loan. In 2012, Urban Partnership Bank took over South Shore Bank; foreclosure proceedings were initiated on the home. AJSF, p. 3; Tr. Transcript, p. 39. The foreclosure was finalized in December, 2013 when Urban Partnership Bank secured a deficiency judgment against Ms. Hopson. Tr. Transcript, p. 41.

Between 2014 and 2016, Ms. Hopson secured temporary social work assignments earning less than $20,000 in 2014, approximately $26,000 in 2015 and just over $20,000 in 2016. AJSF, p. 4.

In August, 2016, Ms. Hopson moved to Georgia for better employment opportunities and started out as a bus driver for Fulton County Community Schools where her average monthly net pay was $1395.86. AJSF, p. 5. Ms. Hopson stopped working as a bus driver in August, 2017 when she began working at her current job as a Case Manager with the Georgia Division of

Family and Children Services ("DFCS") making a gross salary of $42,816.00 ($2439.83 net monthly income). Plaintiff's Exhibit No. HX15-0016; AJSF, p. 5.

*III. Expenses*

Ms. Hopson's monthly expenses are $2,480.26 per month. Plaintiff's Exhibit No. HX15-0020. Ms. Hopson testified that she guesses that she has a couple hundred dollars left over after she covers her expenses each month. Tr. Transcript, p. 58. ISAC's examination of Ms. Hopson's expenses focused on areas where Ms. Hopson could lower her expenses. Specifically, Ms. Hopson currently lives alone in a two-bedroom apartment where she pays $1200 rent per month even though one-bedroom apartments are available in the same complex for $975 per month. *Id.* at 103. Ms. Hopson has a timeshare she acquired for $9,000.00 in 2003 that costs $71.67 per month in membership and maintenance fees. AJSF, p. 6. As part of her current job, Ms. Hopson receives a mileage reimbursement of $0.545 cents for every mile driven while working. Tr. Transcript, p. 160. The reimbursement checks are not the same each month but Ms. Hopson agreed that the average mileage reimbursement check is $300 despite listing the same amount as a non-reimbursed expense. *Id.* at 163-164. Ms. Hopson disagreed that the reimbursement checks are a benefit because she pays for the costs out-of-pocket before receiving the funds. *Id.* at 162.

Ms. Hopson participates in her employer's pension and 401K programs where she contributes an additional three percent of her income in addition to the mandatory five percent. Tr. Transcript, p. 57. The paycheck for the pay-period ending April 30, 2018 shows that $142.73 goes to Ms. Hopson's 401K with another $22.30 going to "S Retir". Plaintiff's Exhibit No.

HX20, p. 1. Ms. Hopson's 401K is her only source of retirement savings; it has a $1,300.00 balance. Tr. Transcript at 57.

Ms. Hopson agreed that the items identified as potential cost savings amount to approximately $900 per month. Tr. Transcript, p. 173. The total savings amount reached in court was $1200.74 but Ms. Hopson disputes that the $300 for mileage reimbursement should be counted as a benefit. *Id.* The court agrees; it is not a benefit.

*IV. Other Factors*

Ms. Hopson is 63 years old and if she retires now her monthly Social Security benefits would be $1230, $1430 if she retires in two years. Tr. Transcript, p. 85. Ms. Hopson testified that she understood that Social Security Income does not count towards gross income but did not realize that if Social Security was her only source of income, her income-based repayment amount would still be zero dollars per month. *Id.* at 114.

Ms. Hopson experienced being a victim of abuse as a child and adult, the details of which are not germane to this opinion. Tr. Transcript, pp. 15-17, 70. Ms. Hopson testified that she thinks about those experiences from time to time but she is able to manage it. *Id.* at 74-75.

Ms. Hopson described symptoms of Lupus that began in 2014. Tr. Transcript, p. 78. She is currently in therapy and on medication but no doctor has ever told Ms. Hopson that her health issues make her unemployable. Tr. Transcript, p. 171. Ms. Hopson testified that her employer's requests that she work more hours without pay causes stress, which then causes her Lupus symptoms to flare up. *Id.* at 78.

Ms. Hopson is seeking a discharge to alleviate the burden of the student loan debt. Tr. Transcript, p. 90.

*V. Analysis*

In this case, Ms. Hopson received a discharge under 11 U.S.C. § 727. *See* Bankr. Dkt. No. 30. 11 U.S.C. § 523(a)(8) provides that a discharge under section 727 does not discharge an individual debtor from student loan debt unless excepting such debt from discharge would impose an undue hardship on the debtor and the debtor's dependents.

The key term in 11 U.S.C. § 523(a)(8) is undue hardship. Unfortunately, the Bankruptcy Codes does not define the term "undue hardship." *In re Roberson*, 999 F.2d 1132, 1134 (7th Cir. 1993). However, the Seventh Circuit has adopted the *Brunner* test established in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2nd Cir. 1987) to evaluate whether student loans should be discharged for "undue hardship." *Roberson*, 999 F.2d at 1135. *Brunner* allows a debtor to discharge student loan debt if the debtor proves:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans;
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
> (3) that the debtor has made good faith efforts to repay the loans.

*Id.* If a debtor fails to establish any one of the elements, the court need not continue with the inquiry. *In re Williams*, No. 15BK38704, 2018 WL 1229719, at *4 (Bankr. N.D. Ill. Mar. 8, 2018) (citing *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002)). The Debtor has to prove each element by a preponderance of the evidence. *In re Duranni*, 311 B.R. 496, 501 (Bankr. N.D. Ill. 2004), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Durrani*, 320 B.R. 357 (N.D. Ill. 2005).

The first prong of *Brunner* requires an examination of the debtor's current financial situation to determine whether payment of the loans would cause her standard of living to fall below what is minimally necessary. *Roberson,* 999 F.2d at 1135. The 7th Circuit revisited the first *Brunner* prong in *O'Hearn*, where it set aside an undue hardship discharge of student loans for a debtor with no dependents and an annual salary of $43,000.00 because it found that the bankruptcy court's decision was not grounded on factual inferences supported by the record. *In re O'Hearn,* 339 F.3d 559, 565 (7th Cir. 2003). The *O'Hearn* Court continued their questioning of the bankruptcy court's analysis stating,

> The court allowed Mr. O'Hearn to justify a rent payment to live in his fiancée's house that was nearly $500 higher than the amount he apparently would have paid for a two-bedroom apartment in the Portland area. The court based this justification on two assumptions: that Mr. O'Hearn would have to live alone if he rented an apartment; and that by living alone many of his expenses, no longer shared, would likely double. We cannot see how this record necessarily supports these conclusions.

*Id.*

Comparatively, Ms. Hopson lives alone and the evidence presented supports the argument that she could reduce her expenses by moving into a one-bedroom apartment in her building for $975 as opposed to the $1200 per month she currently pays for a two-bedroom apartment. Neither party produced evidence comparing Ms. Hopson's expenses vis-a-vis National and Local Standards provided by the IRS. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I) (Generally, deductions allowed for debtors subject to the means test, in part, consists of the applicable monthly expense amounts specified under the National Standards and Local Standards issued by the Internal Revenue Service).

Moreover, Ms. Hopson's responses to interrogatories show her having a monthly net income of $2439.83 and monthly expenses of $2480.26, which would make her short each month by $40.43. That conclusion, however, differs from Ms. Hopson's credible testimony that she has a couple of hundred dollars left over at the end of each month, before taking into account any of the potential cost savings she could make.

The Debtor directs this court's attention to the *Durrani* case, where the court ruled that a Chapter 13 Debtor's student loan debts were dischargeable under 11 U.S.C. § 523(a)(8). Assuming Ms. Hopson's testimony about the couple of hundred dollars left over after each month is true, her situation is similar to the debtor in *Durrani* who had a surplus of $166.00 after all of her necessary expenses were covered. *Durrani*, 311 B.R. at 500. *Durrani* is instructive because "the question framed by *Brunner* in this first prong is whether Durrani can maintain a minimal standard of living if she is required *to repay this loan,* not whether she has any surplus in her budget available for a monthly payment." *Id.* at 505 (emphasis in original). However, Ms. Hopson's case is distinguishable from *Durrani*. None of the student loans in *Durrani* were enrolled in Income Contingent Repayment Plan ("ICRP") plans. *Id.* The court noted "even if Durrani could afford the [$331] ICRP payment—which the court has not found she can do—enrolling in the ICRP would result in negative amortization and the amount of this loan would continue to grow throughout the 25 year repayment term." *Id.* The Debtor's situation is different. The *Durrani* debtor had significant health limitations that made it unlikely that her income would increase. Ms. Hopson has no such limitations.

The Debtor asserts that if she were forced to repay her student loans over a ten-year period, she would have to pay $1,111 per month. The court disagrees. Unlike *Durrani*, Ms.

Hopson's student loans are currently enrolled in IBR plans - her monthly payments are zero. The Debtor is correct that courts are obligated to consider not just a snapshot of a debtor's current situation but her likely future income based upon her education and employment. *In re Wallace*, 557 B.R. 129, 139 (Bankr. E.D. Ark. 2016). Even if Ms. Hopson's sole income was Social Security now or in 2020, the drop in income would very likely keep her IBR payments at zero dollars per month.

Another factor considered by courts in evaluating the totality of the circumstances is the availability and the pursuit of an ICRP. Courts have rejected a "per se" rule requiring enrollment in an income driven repayment plan to establish a debtor's good faith effort to repay his or her student loans. The Sixth Circuit explained that had Congress intended participation in those programs to repeal discharge under Section 523(a)(8) it could have said so. *In re Barrett*, 487 F.3d 353, 364 (6th Cir. 2007).

In *Kreiger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 883-84 (7th Cir. 2003) a district court judge thought that a debtor "fails the good faith standard, because she had not enrolled in a program that would have offered her a 25-year payment schedule."

The Seventh Circuit ruled that "[T]o the extent that the district judge thought debtor *always* (emphasis) must agree to a payment plan and forego a discharge is an incorrect proposition." *Krieger*, 713 F.3d at 884. The availability of income based repayment programs is only one factor to be considered in determining undue hardship. *See In re Long*, 292 B.R. 635, 639 (8th Cir. B.A.P. 2003) ("We do not believe a twenty-five year repayment period creates an undue hardship.").

The court is aware of the tax consequences of the repayment programs - that a debtor could face income tax liability for the amount forgiven at plan conclusion. Debtors can seek exclusion from gross income for income tax purposes the amounts forgiven. 26 U.S.C. §§ 108(a)(1)(A) and (B) which provide for exclusions from gross income for tax purposes of debts discharged in a chapter 11 case. Essentially, debtors can seek a bankruptcy discharge of this kind of tax debt after completion of the repayment plans. Debtors can seek exclusion from gross income of the amounts forgiven if they get it discharged in a chapter 11 case or get it discharged while they are insolvent. 26 U.S.C. §§ 108(a)(1)(A) and (B). *See Greene v. U.S. Dept. of Educ.*, No. 4:13CV79, 2013 WL 5503086, at * 6, (E.D. Va. Oct. 2, 2013) ("Greene finally argues that the bankruptcy court should have accounted for the potential tax liabilities that she would incur once the 25 year repayment period is complete and her remaining loan balance is written off by DOE. The bankruptcy court correctly found that this argument is too speculative."), *aff'd* 573 F. App'x 300 (4th Cir. 2014).

This court finds that Ms. Hopson can make monthly payments on her student loans while enjoying a substantial standard of living, which she is now doing. Ms. Hopson has not met the first *Brunner* prong by a preponderance of the evidence that repayment of her student loans would cause her to not have a minimal standard of living. This finding obviates the court's inquiry into the second *Brunner* factor (additional circumstances exist that this state of affairs - that debtor can not maintain a minimal standard of living and make the payments - is likely to persist for a significant portion of the repayment period) and the third *Brunner* factor that the debtor has made good faith efforts to repay the loans.

*VI. Conclusion*

The Debtor's student loan debts are not dischargeable.

The court thanks Attorney Adam Merrill for his diligent efforts and zealous advocacy on behalf of the Debtor.

This Memorandum Opinion constitutes this court's findings of fact and conclusions of law. A separate Judgment Order will be entered.

**Date: June 22, 2018**                                    **Entered:**

*[signature: Jacqueline P. Cox]*

**Judge Jacqueline P. Cox**
**United States Bankruptcy Judge**